Good morning. Good morning, Your Honors. Richard Hamlisch, appearing for the appellant to please the court. There are really three issues I would like to talk about this morning. Number one, the absolute immunity of the county employees, the three officers, the county nurse and the social worker. The second issue is the qualified immunity of the same people. And thirdly, the 11172 absolute immunity of the physicians. The initial issue I'm going to talk about is the physicians' immunity under 1172. Before we get into that, can I ask you in what respect are these doctors state actors? They conspired with the social worker and the police officer, Keller, in preparing documents which would be used in the attempt to take the child from America. Taking the allegations in the light most favorable to you, as far as I can tell, all they did was give a report of their findings of what they did to treat this child. I don't know what else they did. They wrote a letter saying, I saw the child on this day and on that day, we performed this operation and so forth. How can that... I think they took a step beyond that. They gave an opinion. Okay, so they rendered a medical opinion. Well, I don't think it was a medical opinion in that sense. It was an opinion as to causation of the conduct of the parents, which was used in a criminal setting. I understood the doctors to opine that there's a 99.9% chance that these injuries were caused by shaken baby syndrome. He didn't say they did it or they did it or anything else. This is, I looked at the injuries. I'm an expert on these things. This is how these injuries are often caused. How can that make them state actors, whether they're right, wrong, or otherwise? Well, the fact that the way the reports were used, and let's take a step back. The reason for the reports, absent the 300 petition and absent the request by the county employees, the state actors, those letters would never have been written. They weren't mandated reporters. The mandated reporter was, I think her name was Minkoff. She was an employee of the Cedars-Sinai Hospital. Rightly so, she reported within the law. That's what you're supposed to do. But these doctors weren't mandated reporters. So to make sure I understand, you would have us adopt a rule that says if police or other state actors contact doctors and ask for a medical report, that converts the doctors into state actors? If the reports are used in a criminal setting, yes, and the reports are based on other than facts. These reports were based on, gave opinions as to what happened prior to the surgery, without any facts being present in the doctor's hands. In other words, to use an illustration, my next-door neighbor has a broken arm, a five-year-old. He has a broken arm. And I report it in good faith that I think there was abuse. A police officer comes to me and says, will you give us a statement? And I say, okay, I believe that there was abuse here. The police officer says, did you see it? I said, well, no, I didn't see it, but that's what I believe. He says, well, will you give me a report that you saw it? And that becomes a conspiracy in the, I become a state actor. And that's what happened here. It was ten days of pressure by the police and the social worker to get this letter of detriment. It wasn't given, they didn't just write it out. It was ten days later, February 26th through March 8th or 9th or 10th, whatever the date was. But it's a long time, and it was six or seven visits before the doctors agreed to give these reports. What about the other folks in the case? What about the social workers and the cops? Do you want to move on to the others? Okay. I think the Beltrans case takes care of the absolute immunity. This case, the oral argument in this case was delayed because of the end-by-end bank hearing on Beltrans' case. And I think the Beltrans case says directly that there's no absolute immunity for falsifying or fabricating or preparing reports which are not true. And in this particular case, it's from the evidence. The reports in the 300 petition were that Ryder Robertson was a truant. His parents couldn't control him. And I can't remember all the other things that were in that report, which would apply to an adult, an 18, 17-year-old, who might be placed within a ward of the court, but not an 8-month-old child. And that's what the allegations were by the police and the social worker. They just used the wrong forms. I mean, in the court, Chuck Campbell, I'm sorry, Judge Campbell in the Ventura County Superior Court looked at it, and he said, where is the abused child, where is the person you want to? And they said, he's an 8-month-old or 9-month-old, whatever it was at the time. He said, well, this is talking about a truant from school who was under a public education. And they said, well, you know, it's the wrong form, Your Honor, we're sorry. And it was completely out of contact with what was really going on. The under the Baldwin case, which is cited in my brief, there's no qualified immunity or absolute immunity when there's allegations of conspiracy. When you're conspiring with among each other, you lose that immunity. And that's what the Baldwin case talks about. I think in terms of qualified immunity, I think there are genuine issues of material fact as to what happened. I think that the appellees in this case will get up here and talk, and they will say, Wayne, the police officers didn't do this. This wasn't what they did. This is not how things happened. They didn't coerce the doctors into signing these letters of detriment. But all those items are genuine issues of material fact. And if we took the transcripts of the superior court hearing, I think, and put them into the district court, I think that we would have an entirely we wouldn't be here today. But the district court didn't want to be involved in that. He wasn't bound by the findings of the superior court. And I understand that. What were the findings? The findings were that the child's no longer dependent. Well, the findings were that. It doesn't add anything one way or the other. Well, I think that the transcript of the hearing showed that there was no investigation or a little no investigation as to really what happened to this child. And the most I can get out of the state court finding is that it's now safe to return the child home. I mean, that's the most I can discern from it. Well, I think the understanding here is in the 300 petition case, the social worker or the police officer, whoever it is, brings in a petition to the court, and the court literally says, until we have a full-blown trial, a hearing, I'm going to take the child and put it in foster care. That's a maybe not a good policy, but that is a policy which I understand. We don't know at the particular time what's going on. But when we find out that the reports to the probable cause certification, et cetera, when they contain false statements, they're done on the wrong statements, on the wrong reforms, they just ‑‑ it's completely wrong. And Judge Campbell stated that from the bench. He said this is at the time of the decision. He said this should have been here in the first place. Insofar as the doctors are concerned and 1172 is concerned, I think it's whether you go back to Wallace versus Spencer or any of the other cases, state immunities do not apply in this court. And the district court here said, well, they do. It's not very hard. The case of Doe versus University of California, which is Judge Carleton out of the Eastern District, although our district court did not have that decision, it was post our case, but he laid it out very, very succinctly that state immunities did not apply in federal courts. And I don't think ‑‑ and our district court applied absolute immunity to everybody based on 1172. That was his decision. Can you tell me what exactly the police officers did that violated a constitutional right? Well, the two police officers participated and they attempted to coerce my clients into participating in what are called cold calls. They asked them to do a pretext call to the babysitter. Pretext call. Where do they have a constitutional right not to be asked to do that? No, they don't have a constitutional right. It's what was going on in the meantime. My clients agreed to the pretext call. It was all set up. And only through an inadvertent social contact with a member of the Ventura County Sheriff's Department did they find out that the person who they were supposedly having a pretext call had been set up with a dialogue to implicate my clients. In other words, Sergeant Warham or whatever, and the other officer, had given a script. And the script says, well, how badly did you shake him? And how many times did you drop him? And things of that sort. And my client could deny or whatever they would say on the phone, we don't know, but they found out inadvertently that this pretext call was not for the purpose of implicating the other person. It was implicating them. What constitutional right is violated there? I would guess the right to due process. I mean, the police are investigating a child abuse case, and they're trying to figure out who did it. And I don't know that your clients have a constitutional right not to be thought of as a suspect. I mean, where do they have a right not to be investigated? I think they have a right to be investigated. I think they have a right not to incriminate themselves. And this is what was an attempt to through the back door of testifying against themselves in a pretext call. You know, if they're in custody, then they have the right to Miranda warnings. And if they don't get them, I understand the constitutional violation there. I don't understand this other constitutional right that you're saying was violated. The right not to be investigated. They don't have a right not to be investigated, no. But they have a right to a fair investigation. They have a right not to be told one thing when something else is true. And that, I think, is beyond question. Police officers, I don't have the cases in front of me, but police officers don't tell the truth to a suspect. And they have the suspects confess by telling them their co-conspirator, their co-defendant confessed. There's some rights there. Police officers have to be honest about what they're doing. And in this case, they weren't honest about what they were doing. Okay. Did you want to reserve some time? Yes, I do. Judge Hall, did you have anything? No. Judge Nelson? Okay. Okay. Just the last thing before we go. The Monell issue. The court said that somehow I had waived the Monell issue. I'm not sure how he came to that conclusion. But what he said was that I had alleged that the county ratified the policies of the county. And that's not really what I alleged. I alleged that the county ratified the conduct of the county employees, which is a lot different. And I think that that is a valid cause of action. And I think that for the trier of fact to determine whether or not there was a ratification. Thank you, Judge. We'll show you have five minutes left on rebuttal. Yes, thank you. Thank you. Good morning, Your Honors. May it please the Court. Kent Bullard on behalf of defendant physicians Harold Amer and Neil Kaufman. These are two of the physicians at Cedars-Sinai Medical Center who prepared letters of detriment reporting the suspected child abuse of the infant. We've argued three separate bases for affirming the district court's judgment. No state action, no causation, and that there is statutory immunity for reporting suspected child abuse. We believe that the immunity ruling was correct, and I'm certainly happy to answer any questions you have about that. But I did want to focus, as the court already has, on the no state action issue, because I think that goes to the heart of whether the plaintiffs can state any Section 1983 claim against the physicians. The physicians were privately employed at the non-state-owned hospital where the baby was flown for an emergency neurosurgery. They are alleged merely to have provided their medical judgments, and based on their diagnoses of the baby who exhibited textbook hallmark symptoms of shaken baby syndrome and if, as plaintiffs seem to suggest in their argument, that the physicians could only base their opinions on things they had actually witnessed, that would render the statutory immunity and the reporting statutes basically a nullity as to physicians. I mean, the whole purpose of them is that when physicians see a child based on their diagnostic tools that appears to – that they have reasonable suspicion was a victim of non-accidental trauma, that they have to report that. And plaintiff's theory that somehow they would have to have witnessed what happened would render those statutes virtually useless. Based on the factual allegations in the complaint, all we have is that the physicians were requested to prepare these letters. They did so, and then the county used the letters in the proceedings, in the Section 300 proceedings in the state court. The doctors did not enlist the aid of the government officials. They did not themselves act in a quasi-governmental capacity, and they did not enter into any conspiratorial agreement with the government officials to violate plaintiff's constitutional rights. And to deem those state actors under these circumstances would greatly reduce the effectiveness of the reporting immunity statutes. And the plaintiffs ignore the Brown v. Neuberger case out of the First Circuit, which is, as far as we could find, the only circuit court-level opinion on this issue, and it finds that private physicians do not act under color of state law when making mandatory child abuse reports. The plaintiffs have chosen to ignore the Blum v. Uretsky case out of the U.S. Supreme Court, which we cite for the proposition that the letters of detriment given by the physicians express their medical judgment based on their diagnoses, and that there's no state action in that medical judgment. The complaint basically alleges that they provided the reports only in response to the government actors' requests. The physicians aren't willfully using the government to accomplish anything. They're just responding to the government officials' requests for information. And there's also a normative component to state action, and here there are huge countervailing reasons against finding state action, the main one being that deeming physicians state actors would, under these circumstances, would greatly reduce Congress' and the state legislator's intent of promoting reporting under these circumstances. It would be a little solace to a physician to avoid state law claims if the physician can still be sued under Section 1983. So the only thing that plaintiffs depend on, really, for their Section 1983 claim in order to fill the void of state action is the conspiracy allegation, but it's simply an utterly conclusory conspiracy allegation. And as one of the lower court cases we cited called Bryant-Bruce stated, if you find a conspiracy, you know, any time that you found a conspiracy based on these circumstances, you'd have to find one any time the government asks reporters for a report and the reporters give them a report. And that's simply insufficient to state a conspiracy. It looks like I'm just about out of my time. I'm happy to answer any questions, though, if the Court has any. Thank you, Mr. Bullard. Good morning. Good morning, Your Honors. I'm Peter Osinoff, and may this please this Honorable Court. I agree with the arguments made by Mr. Bullard. Which are your clients? My client is Dr. Kenneth Wright only, and he stands in a very similar position to the other physicians. But I do want to draw some attention of this Court to the differences and why he's even more removed when it comes to the issues of state action or conspiracy. Dr. Wright examined the baby's eyes three times. This is alleged in the pleadings themselves in the Second Amendment complaint. He is an ophthalmologist. He did the examination after hemorrhages were found in the head and in the eyes by other physicians, and his examinations confirmed that finding. The allegations of the Second Amendment complaint as to Dr. Wright are that he didn't refuse once, not twice, but three times refused to provide a letter of detriment. He simply did not even provide the letter of detriment. He never sent one. The allegation is that he refused categorically to state that the child was a victim of shaken baby syndrome, although that was highly likely. However, after his third examination and after having the benefit of the opinions of the other physicians, multiple physicians, he agreed that he would provide testimony consistent with his medical records and his opinions at a custody hearing. He never provided testimony. This isn't a case where he allegedly gave false or perjured testimony or any testimony of any sort in the underlying proceeding. That constitutes his entire role in this alleged conspiracy, that he discussed the case when he was approached by the state officials, the police or the agency officials, and that he agreed that he would testify. An agreement to testify at a superior court proceeding cannot constitute state action. That would have an immense chilling effect not only on child abuse cases, but also it would have an immense chilling effect on First Amendment implications as well. This is not a case where a witness is alleged to have campaigned against the parents or to have committed perjury in order to have the parents found liable. This is not a case where Dr. Wright or anyone else concocted a false story in order to blame the parents to cover up his own negligence. In both of those exceptional cases, there was a private party who in effect took on the role of state actor, fabricating the case, creating and prosecuting the action. The fact that Dr. Wright was contacted by the county defendants and discussed his findings with them and agreed to testify does not convert any of his conduct in that regard, which is all his conduct in this case, into state action. The application of state law immunity, if I can turn to that for a minute, state law immunity in this case is absolutely consistent with federal law, and the appellant undercuts his own argument in this regard when at page 7 of his reply brief, he points out that the federal law is broader in scope than the state law, in that the federal law immunizes all persons who provide information or assistance in connection with an investigation or legal intervention pursuant to a report of child abuse, not just the initial reports of child abuse. Dr. Wright's conduct, of course, would be immunized by federal law, and in any event, since the federal law is consistent with the state law, which immunizes reporting, then the state law would certainly not be preempted by federal law in this case. The state law immunity would clearly apply in this case, certainly applies to the actions alleged in this case, and there is no reason whatsoever to throw out state law immunity governing the defendants' actions in this case, particularly Dr. Wright. Thank you very much. Thank you, Mr. Russell. Good morning, Your Honor. Brian Capron appearing on behalf of Appellees County of Ventura, Deputy Jody Keller, Sergeant David Wareham, Deputy Scott Peterson, and Social Worker Donna Keenan. Your Honor, the basic undisputed fact of this case is that two board-certified pediatric medical experts at Cedars-Sinai Medical Center informed the social worker and the deputy that Ryder-Robertson had sustained subdural hematomas and bilateral retinal hemorrhaging, which, in their opinion, was most consistent with and most likely caused by shaken baby trauma. In fact, Dr. Wright told them that, told the defendants, that the retinal hemorrhaging was almost certainly caused by shaken baby trauma. The doctors also informed the social worker and the deputies that these were recent traumas, one that happened within approximately one week and one approximately two to three weeks earlier. The parents admitted to the defendants that they and the daycare provider were the sole persons who had custody of the child during the past 30 days, and neither the parents nor the child care provider could give any explanation of any recent trauma that could explain these symptoms that the doctors had reported to them. So basically, at the time this petition was filed, the child had suffered serious life-threatening injuries. The medical experts had opined that these were consistent with infantile shaking and were most likely caused by infantile shaking. The child's parents and daycare person couldn't provide any explanation regarding any recent trauma, and they could not be – and the parents could not be ruled out as the perpetrators. Now, regarding this fabrication of evidence charge, the first thing, Your Honor, is this contention that was put forth in Appellant's letter brief, that the social worker and the deputy were trying to mislead the juvenile court judge into believing that an eight-month-old child was a juvenile delinquent or had violated curfew, is really absurd on its face. It's not a genuine issue of material fact. No reasonable jury would ever believe that that was the social worker's or the deputy's intent. And I would also say that counsel's characterization of the juvenile court's statements, alleged statements at the hearing, are without any support whatsoever in the record. There's no record whatsoever that this juvenile court judge made any comments about being misled or believing that this was an older child. The fact is that this was an eight-month-old child. No one at any time tried to mislead the court in thinking that this was a juvenile delinquent that was involved. So there's no evidence whatsoever as to fabrication of evidence. Now, I agree that under Beltran there's no longer absolute immunity for fabricating evidence in a petition and there's no longer absolute immunity for investigatory conduct. But in this case, and this is a summary judgment motion, there was no evidence presented whatsoever of fabrication of evidence. Well, their argument, if I understand it, correct me if I'm wrong, is that the report to the court omitted that there was a birth injury and it likewise misrepresented that the child had been well shortly before the event when he'd really been sick. That seems to me to be their biggest point. Your Honor, the record is very clear, and you can look at the court transcript at 242 to 249. Ms. Keenan provided the court not only with Dr. Ameyer's medical report, but she also provided a 19-page summary of the investigation, which included in it a seven-page summary of the mother's recitation of the child's medical treatment before admission into Cedars-Sinai. And that recitation, and it's right in her report, and it's in the record, the mother's recitation that was reported to the court was that there was a 71-hour labor, there was a complex delivery, that the child was born with huge hematoma on the head, that he had reflux and vomiting problems, that the doctors had given many medications and there were problems with taking the medications. Ms. Keenan reported to the court, and again, it's in the record very clearly in her detention report, that the mother had reported certain problems. Now, they had this phrase, happy and thriving. Well, the mother, in her own declaration, admitted that she had described the child as happy and thriving at times, sometimes, and that probably can apply to a lot of babies, the happy at sometimes, thriving at times, and happy at other times. But there's no evidence whatsoever that either Ms. Keenan, the social worker, or the deputy, the deputy keller, made any false or misleading statements to the court or that they intended to mislead the court in any manner. They did report in seven pages of the 19-page report, seven pages were given to the mother's recitation, detailed recitation, of all the treatments that this child had received. So the idea that we did not provide the mother's side of the case is not correct. And this issue about, well, they didn't mention the head circumference and whatnot, there is sufficient detail in there. There's no evidence that the mother actually told the social workers what the child's head circumference was at the time, but she did relate the problems with the delivery. She did relate the problems that she had early on with the child. And that is in the report. So there was no misleading of the court in that regard. Thank you very much. The only other thing I want to address is the Monell issue, because counsel brought it up. Well, you're out of time, so we'll go to Ms. Clark now. Thank you. Good morning. Good morning. May it please the Court, my name is Maureen Clark, and I represent the appellee Theresa Mayernik. Ms. Mayernik was the registered nurse who participated in the investigation of the child abuse allegations along with Donna Keenan. There is no evidence that was presented by the appellants with regard to Ms. Mayernik either fabricated any evidence or provided any false statements to the juvenile court. The issue, I think, with regard to the happy, thriving baby statement has been addressed by Mr. Kegron, and I'm in full agreement with that assessment. What I would like to point out to the Court is a case that I addressed in the brief, which is the Van Emmerich case, and the circumstances of that case I think are compelling in this instance. In the Van Emmerich case, there was an infant who had been found to have had a spiral fraction of her leg, and an investigation was conducted. The parents thought the babysitter caused the injury. They couldn't find any evidence as to who caused the injury, but there were doctors in that case that said to the social workers and the other investigators that they believed that it was caused by something that was non-accidental. And so they were left with, do we file a petition because we do not have an identified perpetrator, or do we risk injury to the child? And in the circumstance such as that, which we have in this case, where we have doctors who opine that the infant's injuries are 99.9% caused by shaken baby syndrome, although we don't have an identified perpetrator, the injury, the, excuse me, the, you have to err on the side of caution. Public policy requires that you err on the side of protecting the child. State law requires that. In Ms. Mayernick's instance, there's no evidence that she violated any constitutional right that the plaintiffs had. And the evidence suggests that her conduct did not violate any clearly established rights that were in effect at the time of her conduct, which would put her on notice that she was violating any rights of the plaintiffs. With respect to a couple of points of fact made by the appellant at this hearing, I would like to point out that the argument that there would not have been the letters submitted by the doctors but for the fact that they opined that it was shaken baby is erroneous. What was happening at the time of the investigation is that these doctors were asked for their opinion. They wanted it in the form of letters. They would have provided a letter regardless.  Simply, a phone call was made and they asked them, please let us know what your opinions are and put it in writing. It's pure speculation and conjecture by Mr. Hamlisch to suggest that there was pressure involved or coercion. In addition, Mr. Hamlisch had mentioned statements made by Judge Campbell at the juvenile court hearing. None of those statements are evidence in this case. The only he did not put any evidence as to those statements. And in any event, it would be hearsay. If Your Honors have any questions. Thank you. Thank you. Mr. Hamlisch, back to you. You get the last word.  Number one, insofar as the seven-page report or 19-page report referred to by counsel, that was filed well after the petition was filed. It wasn't with the petition. In the petition, there was no mention of the prior history of Ryder Roberts. Did you have any evidence that this long labor or anything else had anything to do with the cause of these injuries? Yes. Dr. Gabriel, Ronald Gabriel from UCLA, USC, both places. What did he say? Pardon? What did he say? He said that the long, prolonged labor caused neurological damage to Ryder Robertson. And today, he is still a patient of Dr. Gabriel. I'm talking about the hemorrhages in the eyes. Yes. The retinal hemorrhaging was caused by intracranial pressure. That's what Dr. Gabriel testified to in the Superior Court. It had nothing to do with any shaken babies or anything else. He testified for most of the day, and then he testified a second time. And the conclusion was there was no shaken baby. It was the 71 hours of the child's head banging against the cervix. And that's what caused it. And the child's head went from 50 percentile, which is the normal, in six weeks, he was at the 90 percentile, which means his head was almost twice as big as normal at six or eight weeks. I can't remember which one it is. And his head continued to grow. And that's another issue in another place. But none of that was placed before Dr. Amer, Kaufman, or Wright. They didn't know anything about this when they made their opinions as to the letter of detriment. They were not told about this. In fact, I don't think the police officers knew about that. They never even got into it. Was there a suit against the obstetrician for letting this go on for 72 hours? Yes, there is. There is a suit against the obstetrician. There is a suit against the pediatricians for not recognizing and seeing this head growth, which I am trailing in that trial right now in the Ventura County Superior Court, as a matter of fact. But talked about congressional intent. The congressional intent is clear. The Congress, and it's a very interesting story about it, but the Congress said that the states were to immunize the mandatory reporters as to state and local regulations. It did not say anything about federal statutes. The interesting thing is, well, is that one of the authors, the co-authors of this bill in Congress years ago was Barbara Boxer, our senator. And never, there was, and the congressional record shows no intention. In fact, they said, we're interested in malpractice cases against the doctor for false reporting. We're not interested in constitutional issues here. The district court actually said in its opinion that the conspiracy charge was well pled. And so I'm not sure where the argument is coming from, that there's no appeal by defendants or by appellees to strike that part of the appealing. As far as the issue that counsel raised as to the federal mandated report of immunity law, which is for federal employees in federal hospitals. It's not for the public. And I forgot the statute number, but that particular statute is only for federal employees in federal hospitals. It says nothing. And California did not follow that statute outline when it wrote its own, 11-172. It went on its own. It did not follow the Pennsylvania statute or the New Jersey statute, which are modeled under the federal statute. The argument here was Dr. Wright never testified at the superior court. That's not true. I sat there and watched him. He testified once by telephone and once in person at the superior court. And he was questioned by Judge Campbell individually as to what happened there is really not of importance here, but it was an interesting observation. Okay. So you're out of time, Mr. Hamlisch. Thank you very much. Thank you. Thank you, Ms. Clark. And, gentlemen, the case just argued is submitted. Thank you. Judge Nelson, with your permission, we'll take a ten-minute break and start the next one. Is that all right with you? You've got my permission. Okay. We'll take up Aramark v. Service Employees International Union in ten minutes. Thank you.
judges: Hall, Nelson, Silverman